UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>ANTOINE RAY THOMAS,<br><br>                    Defendant. | 4:22-CR-40046-1<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Antoine Ray Thomas is before the court on a superseding indictment charging him with conspiracy to distribute controlled substances and possession of a firearm by a prohibited person.  See Docket No. 35.  Mr. Thomas has filed two motions to suppress certain evidence.  See Docket Nos. 96 and 106.  The United States ("government") resists the motions.  See Docket Nos. 100 and 109.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD L.R. 57.11.

**FACTS**

An evidentiary hearing was held on August 10, 2023.  Mr. Thomas attended in person along with his lawyer, Angel Runnels.  The government was represented by its Special Assistant United States Attorney, Elizabeth Ebert.

1

Three witnesses testified and 2 exhibits were received into evidence.  From this testimony and these exhibits the court makes the following findings of fact.[1]

Officer Grant VanVoorst testified that he is a K9 officer with sixteen years of experience at the Sioux Falls, South Dakota, Police Department—ten years as a K9 officer.  K9 officers run dogs for the dual purpose of criminal apprehension and narcotics matters, including interdiction.  Narcotics detectives use K9 officers as a tool for investigation.  Officer VanVoorst was working in his K9 officer capacity, in full uniform in a marked patrol vehicle, on the night of February 10, 2022.

At approximately 8:12 p.m. on February 10, Officer VanVoorst initiated a traffic stop in Sioux Falls involving defendant, Antoine Thomas.  Ex. 1, clip 1 at 01:02; clip 2 at 20:11:53.  Officer VanVoorst testified that when he initiated the traffic stop, he did not know the identity of the driver.

Officer VanVoorst testified that on that day, the Sioux Falls undercover narcotics unit was surveilling a house.  The unit observed "multiple individuals" leave this house.  The unit believed that a suspect, Rigoberto Hernandez, may have been in the vehicle that Officer VanVoorst was following. Officer VanVoorst testified that "this [stop] was targeted for narcotics" and he was "looking for a reason" to stop the vehicle.

---

[1] Exhibit 1 to this hearing contains two clips. Clip 1 displays Officer VanVoorst's dashcam footage, which includes no timestamp.  Clip 2 displays Officer VanVoorst's bodycam footage, which includes a timestamp. Correspondingly, citations to Clip 1 refer to the timing of the videoclip. Citations to Clip 2 refer to time of day, as determined by Officer VanVoorst's bodycam.  Clip 1 has no audio.  Clip 2 has audio.

The first video footage from Officer VanVoorst's dashcam shows the vehicles waiting at a red light at the intersection of 14th Street and Cliff Avenue in Sioux Falls, facing eastbound.  Ex. 1, clip 1 at 00:06.  Officer VanVoorst's patrol car[2] and Mr. Thomas' vehicle were in the left turn lane with a Toyota Tundra pickup truck between them.  Id.

When the light turned green, Mr. Thomas' vehicle, the Tundra pickup, and ultimately Officer VanVoorst's patrol car turned left (northbound) onto Cliff Avenue.  Ex. 1, clip 1 at 00:27.  During this sequence, no vehicles appear at the intersection in the oncoming westbound lanes of 14th Street, either traveling through or attempting to make a right (northbound) turn on to Cliff Avenue.  Id.  Cliff Avenue at this intersection is a five-lane road consisting of two southbound lanes, a middle left turn lane, and two northbound lanes.  Id. at 00:35.  The dashcam footage does not reveal which lane Mr. Thomas drove into when completing his left turn.  Id.

Officer VanVoorst testified that when turning into multiple lanes of same direction traffic, the law requires a driver to first establish himself in the nearest lane (here, the left northbound lane), before proceeding into an outside lane.  Officer VanVoorst testified that he observed Mr. Thomas' Trailblazer make an illegal wide turn directly into the outside lane of Cliff Avenue.  Officer VanVoorst also testified that as he completed his left turn, Mr. Thomas' vehicle was already in the outside lane and that he did not notice any blinkers

---

[2] Officer VanVoorst testified that he drove a department-issued Ford F150.

activated on Mr. Thomas' vehicle that would indicate an intention to go into the outside lane.

The first time post-turn that Mr. Thomas' vehicle comes into frame in the dashcam footage is when it is in the outside lane. Ex. 1, clip 1 at 00:33. On cross-examination, Officer VanVoorst agreed with defense counsel that the location of Mr. Thomas' car as it comes into view in the dashcam footage was the same location Officer VanVoorst's patrol car legally entered the outside lane after first turning into the near lane. On direct testimony, Officer VanVoorst denied any possibility that Mr. Thomas quickly established himself first in the near lane and then proceeded to the outside lane. He testified that the existence of emergency lights on a vehicle on Cliff Avenue in the distance did not negate the legal requirement of a driver to first establish himself in the nearest lane. He testified on redirect that a clear [outside] lane also does not negate the requirement that a driver first establish himself in the inside lane before moving to the outside lane.

Officer VanVoorst testified that based on this wide turn, he initiated a traffic stop. A voice on the police radio can be heard saying "the guy we're looking for is Rigoberto Hernandez . . . FYI." Ex. 1, clip 2 at 20:11:27. Officer VanVoorst replied that "he" made a wide turn and that he was going to "light him up." Id. He called in a black, dealer-plated Chevrolet Trailblazer, and said "I'll take a 54." Ex. 1, clip 2 at 20:11:53. Officer VanVoorst testified that a "54" is a request for cover (backup). Officer VanVoorst turned on his blue and red

lights, and from Cliff Avenue, Mr. Thomas turned right (east) on to 12th Street and pulled over to the curb.  Ex. 1, clip 1 at 01:02.

Officer VanVoorst then approached Mr. Thomas' vehicle with a flashlight, and Mr. Thomas lowered the window about a quarter length.  Ex. 1, clip 2 at 20:12:19.  Officer VanVoorst greeted Mr. Thomas, notified him of the reason for the stop, and asked for his driver's license.  Id.  Mr. Thomas then produced his wallet.  He was lightly shaking and slightly fumbling through his wallet, but ultimately retrieved and remitted his license to Officer VanVoorst.  Id. at 20:12:34.  Officer VanVoorst testified that he incorrectly testified at the state court grand jury that Mr. Thomas first handed him his debit card when asked for his license.  On redirect, he testified that the video should control what the actual events were, and that he did not make the incorrect statement at grand jury to lie or be untruthful.  He also stated that he did not misstate this fact to ensure Mr. Thomas' state court indictment.

Officer VanVoorst asked Mr. Thomas why he was visiting from California (Mr. Thomas' driver's license was from California).  Mr. Thomas' response is inaudible.  Id.  Officer VanVoorst then told Mr. Thomas he was going to "make sure [Mr. Thomas] was good," and then he would get Mr. Thomas out of there. Id.

Officer VanVoorst testified that it was during this initial approach of Mr. Thomas' vehicle that he first smelled raw marijuana "coming from inside the vehicle," and that the detection of the scent of raw marijuana is part of his specialized training as a K9 officer.  Based on that same training, he testified

that there is a difference in smell between raw marijuana and hemp. He testified that he did not alert Mr. Thomas to his awareness of the smell because that could have jeopardized his safety or caused Mr. Thomas to drive away or flee on foot. Officer VanVoorst testified that it was at this point that the investigation expanded in scope from a traffic stop to a narcotics investigation. Officer VanVoorst testified that he had incorrectly noted in his police report that it was at this moment when he called for cover. He actually called for cover when he initiated the stop. On redirect, Officer VanVoorst testified that it is police department custom for cover to be automatically dispatched after dark—on any traffic stop. Officers Pollema and Horn testified the same.

When Officer VanVoorst returned to his patrol car, he called in Mr. Thomas' name on the radio. Id. at 20:13:44. The voice on the other end told Officer VanVoorst, "You're gonna want your dog" and "He's part of this group." Id. at 20:13:51. Officer VanVoorst testified that he did not at this time tell the voice on the other end that he had smelled marijuana on his first interaction with Mr. Thomas. He also testified that it was unnecessary to do so.

Officer VanVoorst testified that on this return to the patrol car, he also ran Mr. Thomas' ID through the NCIC database and asked for "the cover unit to come up and talk to me." He stated that the reason he asked for the cover unit to come up and talk with him was because of his detection of marijuana, and his desire to explore the source of the smell. He did not include in his direct testimony that during this time, he also called Mr. Thomas' name into

the narcotics radio channel.  He was asked about that omission on cross-examination, and he testified that he was able to do two things at once.

At approximately 8:15 p.m., Officers Richard (Ricky) Horn and Tanner Pollema arrived on the scene.  Id. at 20:15:11.

Officer Pollema testified that he has been a patrol officer with the Sioux Falls Police Department for about 3 1/2 years.  Due to a delay caused by his military deployment, Officer Pollema began his field training in January of 2022 and was still participating in this training at the time of Mr. Thomas' arrest.  Officer Horn was Officer Pollema's field training officer.

Officer Horn testified that he has been a patrol officer with the Sioux Falls Police Department for approximately 7 years.  He has been a field training officer for approximately 3 years.  A field training officer (FTO) trains new officers on the various activities an officer will conduct in his employment, from "criminal investigations" to "community interactions."  Officer Horn was working in his capacity as FTO on the night of February 10, 2022, and Officer Pollema was his trainee.

On cross-examination, Officer Pollema testified that he did have a bodycam on and activated during Mr. Thomas' stop and that he downloaded the footage at the end of his shift.  However, he said that the footage was inaccessible due to expiration after approximately 365 days.

Upon arrival, Officer Pollema knocked on Officer VanVoorst's window and asked him if he needed anything.  Id.  Officer VanVoorst instructed Officer Pollema to ask Mr. Thomas if he had a medical marijuana card because it

7

"smell[ed] like weed in there." Id. Officer Pollema testified that he did not include in his report that it was Officer VanVoorst who first alerted Officer Pollema to the smell of marijuana in Mr. Thomas' vehicle.

Officer VanVoorst also stated that he intended to run his dog on the car. Id. Officer Pollema testified that he was unaware of the broader narcotics investigation until "after the entire incident was done with." Officer Horn testified that he suspected this was a narcotics stop because Officer VanVoorst requested cover, and normally does not perform ordinary traffic stops.

Officer Pollema told Officer VanVoorst he intended to "pull" Mr. Thomas out of the car. Id. Officer Pollema and Officer Horn then approached the driver's side of Mr. Thomas' vehicle. Officer Pollema testified that he could smell marijuana when he was standing at the driver's side B pillar of Mr. Thomas' car. Officer Horn testified that he asked Mr. Thomas about the medical marijuana card and asked Mr. Thomas to step out of the vehicle. He testified that Mr. Thomas requested more information on why it was important for him to step out of the vehicle. Officer Horn told Mr. Thomas he wanted to explain more about the traffic stop.

Officer Horn testified that he had Mr. Thomas exit the vehicle for officer safety reasons and because he believed Officer VanVoorst was going to search the vehicle. He testified that searches are not conducted while the driver is still inside the vehicle. The officers had Mr. Thomas step out of the car. Ex. 1, Clip 1 at 04:48. Officer Horn testified that when Mr. Thomas opened the car door, he could smell the odor of raw marijuana. Officer Pollema testified that he

8

asked Mr. Thomas whether he had a marijuana card, due to the strong marijuana smell, and that Mr. Thomas replied, "No, I'm from California." Officer Horn testified that Mr. Thomas was not Mirandized before being asked this question. He further testified that he believed a <u>Miranda</u>[3] warning was unnecessary for this question because it was analogous to asking for a driver's license. On cross-examination, Officer Pollema testified that he did not include in his report the fact that it was Officer VanVoorst who first instructed him to ask for the medical marijuana card.

The officers escorted Mr. Thomas to the rear of Mr. Thomas' vehicle. <u>Id.</u> Mr. Thomas' hands were in his pockets during this time. <u>Id.</u> Officer Horn then completed a protective pat-down search over the top of Mr. Thomas' clothing. <u>Id.</u> He testified that he felt objects that may have posed a threat, but they were confirmed to be cell phones by Mr. Thomas. Officer Horn testified that he mistakenly typed in his report that he <u>did</u> feel weapons during this pat-down. He meant to type that he <u>did not</u> feel weapons. Following the pat-down, Officer Horn and Officer Pollema escorted Mr. Thomas toward the sidewalk on 12th Street. <u>Id.</u> Officer Horn testified that at this point, Mr. Thomas was detained and was not free to leave.

While Officers Horn and Pollema were with Mr. Thomas, Officer VanVoorst proceeded to inspect the dealer plate and VIN number on Mr. Thomas' vehicle. Ex. 1, Clip 2 at 20:16:22. Officer VanVoorst then returned to Mr. Thomas and the other officers, who were then standing on the

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

12th Street sidewalk, and asked whether Mr. Thomas had a medical marijuana card. Id. at 20:16:45. Officer Horn replied that Mr. Thomas did not have one. Id. Officer VanVoorst talked about the smell of marijuana and asked Mr. Thomas how much weed was in the car. Most of Mr. Thomas' response is inaudible but he can be heard saying the word "California." Id. Officer VanVoorst then stated that the car smelled like weed, that weed was illegal in South Dakota without a medical marijuana card, that he was going to check to see whether "piles of weed" were in the car and then "we'll get out of here." Id.

At this point, Officer Horn can be seen escorting Mr. Thomas to the back of his patrol car and heard asking him to put his hands up. Id. at 20:17:13. Officer Pollema testified that he believed it was at this time that Mr. Thomas was handcuffed by another officer. He then said that he did not recall whether Mr. Thomas was handcuffed at this time. On cross-examination, he repeated that he did not recall whether Mr. Thomas was handcuffed at this time. Officer Horn testified that he put Mr. Thomas in the back of the patrol car without handcuffs for the purpose of officer safety and to prevent Mr. Thomas from fleeing. He further testified that it was raining very hard at the time.

Officer VanVoorst and Officer Pollema then walked to Mr. Thomas' car while Officer VanVoorst repeated to Officer Pollema that because Mr. Thomas did not have a medical marijuana card, marijuana was still illegal in South Dakota, and they could "go off the smell." Id. at 20:18:06. Officer VanVoorst repeated this understanding of the law at the suppression hearing. On cross-

examination, Officer VanVoorst testified that neither Officer Horn nor Officer Pollema expressly stated to him that they smelled marijuana.

Officers VanVoorst and Pollema then began their search.  Officer Horn testified that he stayed with Mr. Thomas while the other officers searched Mr. Thomas' vehicle.  Officer VanVoorst immediately discovered a bag of marijuana sitting conspicuously on the front passenger seat and a duffel bag with what he stated contained a large amount of marijuana on the front floorboard.  Id. at 20:18:36.  In the same bag, he also discovered a gun that he stated was loaded.  Id.  He also stated that he found some methamphetamine.  Id.

Upon this initial find, Officer Horn testified that he had Mr. Thomas step out of the vehicle, notified Mr. Thomas that he was under arrest, and placed Mr. Thomas in handcuffs.  The command log indicates that Mr. Thomas was placed into police custody at 8:25 p.m.  Ex. 2 at p. 2.  At this point, on direct examination, Officer Horn testified that he removed everything from Mr. Thomas' pockets: two cellphones, a small bag with a "rock, chalky substance which [he] believe[d] to be crack cocaine," another bag he believed to be methamphetamine, another bag with blue pills which he believed to be fentanyl, and a large amount of cash.  Officer Horn later testified on cross-examination that he did not recall finding the bag of pills.

Officer VanVoorst returned to his car and called in that he found between 1 and 1 1/2 pounds of marijuana, a gun, and about a pound of methamphetamine.  Ex. 1, Clip 2 at 20:20:26.  As he was returning to

11

Mr. Thomas' car, a different patrol car and officers pulled onto the scene and had a conversation with Officer VanVoorst about the stop. An unnamed officer asked Officer VanVoorst if this was a random stop and he stated "No. Sh-t no." Id. at 20:21:19.

Upon returning to Mr. Thomas' car, Officer VanVoorst found a scale and more of what he stated to be marijuana. Officer Horn appeared at the car with a large amount of cash and a bag in his hand which Officer Horn confirmed were found on Mr. Thomas' person. Id. at 20:22:18. Officer Horn asked Officer VanVoorst "is this something you just found?" Officer VanVoorst replied "No. I'm not that good!" Id. at 20:23:09.

Officer VanVoorst found another loaded gun. Id. at 20:23:45. Officer VanVoorst stated to the officers that if Mr. Thomas "had a medical marijuana card, I woulda ran the dog, because my dog doesn't smell weed." Id. at 20:27:40.

Officers Horn and Pollema then took the boxed and bagged evidence and stated their intent to "run" Mr. Thomas "up there [to the Law Enforcement Center]." Id. at 20:32:30. Officer Horn testified that the reason they brought Mr. Thomas to the Law Enforcement Center was to speak with narcotics detectives.

After a few minutes of sitting in his vehicle, Officer VanVoorst spoke to the wrecker driver who arrived for Mr. Thomas' vehicle, telling him "It smells like weed in there." Id. at 20:44:45; Ex. 1, Clip 1 at 33:40.

Officer VanVoorst testified that he believed he cited Mr. Thomas for
unsafe lane change.

On cross-examination, to refresh Officer Pollema's recollection, defense
counsel played video footage from what Officer Pollema described as the
"property room" at the Law Enforcement Center.[4]  Officer Pollema testified that
the video depicted the collection of Mr. Thomas' personal belongings before his
interview with the detectives.  He testified that besides himself, Officer Horn
and Mr. Thomas were depicted in the video, as well as an unknown additional
officer who was wearing the bodycam from which the footage was supplied.
Officer Horn testified that it was standard procedure to bring a suspect into the
property room to get all personal belongings into a bin before entering an
interview room and to search that property thoroughly once in the bin.  This is
for the purposes of safety (in case any weapons were missed during the initial
search), finding evidence, and traceability of the suspect's property.  He
testified that as part of standard procedure, anything legal on Mr. Thomas'
person would be sent along with Mr. Thomas to jail, and anything illegal would
be placed into evidence.

Once Mr. Thomas was escorted to an interview room, the video footage
depicted Officer Pollema reaching into the bin containing Mr. Thomas'
belongings and pulling out a baggie containing pills.  Officer Pollema testified
that he believed these pills were M30 pills, which are "typically fentanyl."
Officer Pollema testified that this find was not specifically mentioned in his

---

[4] Defense counsel did not move for this footage to be admitted into evidence.

police report. Officer Horn testified the same. Officer Horn testified that he believed it to be unimportant to specifically designate the time a certain number of pills were found. Officer Pollema testified that these pills were brought directly to the evidence room and placed with the evidence found at the traffic stop site. Officer Horn testified the same and that the pills were properly logged at that time.

Officer Pollema testified that he did not recall the events in the property room until defense counsel refreshed his memory with the footage. Officer Horn also could not remember what was found during this process but that any evidence found would be included in the report. Officer Pollema testified that despite his lack of memory on this one matter, his prior testimony concerning the events at the traffic stop site were accurate. Officer Horn testified the same.

Mr. Thomas now "moves to suppress the controlled substances, paraphernalia, firearms and contraband on the grounds that the stop, continued seizure, and subsequent search of the vehicle were in violation of his rights under the Fourth Amendment to the United States Constitution." Docket No. 97 at p. 3. Mr. Thomas additionally moves to suppress his response to the question about a medical marijuana card based on a violation of his Fifth Amendment Miranda rights. Docket No. 107 at pp. 1–2.


*************

14

## DISCUSSION

### A.     Was there probable cause for Officer VanVoorst to stop Mr. Thomas

Mr. Thomas first argues that his traffic stop was an "unconstitutional seizure" under the Fourth Amendment.  Docket No. 97 at p. 3.  The government responds that Officer VanVoorst's observation of the wide turn was sufficient to support the stop.  Docket No. 100 at pp. 3–5.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  A "seizure" occurs when a government actor intentionally terminates or restricts a person's freedom of movement. Brendlin v. California, 551 U.S. 249, 254 (2007).  A traffic stop is such a restriction.  United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004).  A traffic stop, therefore, "must be reasonable to survive constitutional scrutiny."  Id.

A traffic stop is reasonable if a police officer has probable cause to believe that a traffic violation occurred.  United States v. Andrews, 454 F.3d 919, 921 (8th Cir. 2006) (citing Whren v. United States, 517 U.S. 806, 810 (1996)). "Probable cause is a reasonable ground for belief of guilt."  Brinegar v. United States, 338 U.S. 160, 175 (1949) (citations and internal quotation marks omitted).  Probable cause exists when a police officer observes a traffic violation, however minor.  United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (citations omitted).  But observation of the traffic violation is not required; probable cause also exists "when a reasonable officer, confronted

15

with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." Andrews, 454 F.3d at 921 (citations omitted).

If a traffic stop is unreasonable, the Fourth Amendment requires that any evidence procured during that stop must be suppressed at trial, lest "a denial of the constitutional rights of the accused" occurs. Mapp v. Ohio, 367 U.S. 643, 648 (1961) (quoting Weeks v. United States, 232 U.S. 383, 398 (1914)); see generally Delaware v. Prouse, 440 U.S. 648 (1979). Our Constitution's disdain for such illegally obtained evidence is so great that our courts refer to it as "fruit of the poisonous tree." See, e.g., United States v. Durant, 730 F.2d 1180, 1182 (8th Cir. 1984) (quoting Wong Sun v. United States, 371 U.S. 471, 484–85 (1963)).

The reasonableness analysis of a traffic stop turns on the probability of whether a traffic violation occurred, so a police officer's subjective motivation for initiating the stop has no bearing. Whren, 517 U.S. at 813. Police officers often use the pretextual means of a traffic stop to further valid, alternative, investigatory ends. United States v. Cole, 994 F.3d 844, 849 (7th Cir. 2021), rev'd on other grounds en banc, 21 F.4th 421 (2021).

For example, in Whren v. United States, Washington D.C. police officers initiated a traffic stop based on their observation of speeding and failure to signal. 517 U.S. at 808. But the officers were vice-squad officers, and their motivation was suspicion of narcotics activity. Id. Pointing to the pretextual nature of the stop, the petitioner driver argued that if a reasonable police

16

officer would not "have made the stop for the reason given," then the stop should fail a Fourth Amendment analysis. Id. at 810. The Supreme Court disagreed, holding "subjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional." Id. at 813 (quoting Scott v. United States, 436 U.S. 128, 138 (1978)) (alteration in original). The standard is whether the conduct is "objectively justifiable behavior under the Fourth Amendment." Id. at 812. When a police officer observes a driver violating the traffic code, that standard is satisfied. Id. at 819.

In the instant case, Mr. Thomas argues that Officer VanVoorst's initiation of the traffic stop was unconstitutional on four theories: (1) it is implausible that Officer Van Voorst observed a wide turn; (2) the dashcam video does not show a wide turn; (3) Mr. Thomas' turn was in compliance with South Dakota law; and (4) Officer Van Voorst did not have reasonable suspicion to effectuate the stop.

### 1. Officer VanVoorst's testimony that he observed a wide turn is implausible.

Mr. Thomas argues that no probable cause existed for the stop because Officer VanVoorst could not have seen a wide turn due to the darkness of night, the rain, and the imposition of the Toyota truck between his vehicle and Mr. Thomas' vehicle. Docket No. 97 at p. 4. But despite these obstacles, the footage from Officer VanVoorst's dashcam depicts Mr. Thomas' vehicle entering the turn on to Cliff Avenue. Ex. 1, clip 1 at 00:27.

The footage lacks the depiction of depth.[5]  This court cannot conclude from the footage whether Mr. Thomas' vehicle was aiming for the near lane or the outside lane as Mr. Thomas completed his turn.  Id.  Officer VanVoorst, in contrast, testified that he possessed the necessary depth perception to observe Mr. Thomas "go wide" into the furthest lane.  Considering the evidence available through the dashcam footage, the court finds this testimony to be credible.

### 2.  Officer VanVoorst's dashcam does not corroborate his testimony that a wide turn occurred.

Mr. Thomas argues that because Officer VanVoorst's dashcam footage does not confirm a wide turn, no probable cause existed.  Docket No. 97 at p. 4.

While dashcam footage inconsistent with testimony may raise eyebrows, see, e.g., Scott, 550 U.S. at 380–81, Mr. Thomas has identified no legal authority that requires dashcam footage to exist to corroborate credible police testimony.  Cf. United States v. Holly, 983 F.3d 361, 363–64 (8th Cir. 2020).  Moreover, the dashcam footage does not contradict Officer VanVoorst's testimony, it just fails to depict what he saw with his own eyes, a fact Mr. Thomas acknowledges.  Docket No. 97 at p. 4.  So, the footage is not inconsistent with Officer VanVoorst's testimony.  Mr. Thomas put forth in his

---

[5] This is a known failing of video footage.  See Wouter Zwart, *Article: Slow Your Roll Out of Body-Worn Cameras: Privacy Concerns and the Tension Between Transparency and Surveillance in Arizona*, 60 ARIZ. L. REV. 783, 796 (2018) ("Videos are a two-dimensional medium and may not capture depth, distance or positional orientation as well as the human eye.") (quotation omitted).

briefing and at the hearing several theories of what may have happened during the turn.  See, e.g., id.  In contrast, Officer VanVoorst testified that he observed Mr. Thomas "go wide."  This court finds Officer VanVoorst's testimony credible.

### 3.    Mr. Thomas completed his turn safely, and therefore in compliance with SDCL § 32-26-6.

Mr. Thomas was cited under SDCL § 32-26-6, which prohibits unsafe lane changes.  Docket No. 97 at p. 3; SDCL § 32-26-6.  Mr. Thomas makes several arguments as to why his turn was safe, and therefore legal such that probable cause did not exist.  Id. at p. 4.

This court, however, notes that the proper statute governing the conduct in question is SDCL § 32-26-18 rather than SDCL § 32-26-6.  See State v. Erwin, 831 N.W.2d 65, 69 (S.D. 2013) (discussing "SDCL 32-26-18's requirement that left turning vehicles turn into the left most lawfully available lane.").  Under the plain language of § 32-26-18, the prohibited conduct is the incorrectly executed turn—irrespective of whether the driver deems it safe to turn wide.  Accordingly, Mr. Thomas' arguments of safety are unhelpful.

Because the Fourth Amendment analysis concerns whether Officer VanVoorst had probable cause to believe that a traffic violation occurred, the mismatch between citation and conduct cannot move the needle for Mr. Thomas.  Sallis, 507 F.3d at 649.  Officer VanVoorst observed Mr. Thomas making a wide turn—a prohibited act under South Dakota's traffic code.  Correspondingly, probable cause existed, and the traffic stop was reasonable.

### 4.    Officer VanVoorst did not have particularized reasonable suspicion for the stop.

Finally, Mr. Thomas argues that "[a]lternatively, there was no particularized reasonable suspicion for the stop, as the officers had no idea who was occupying the vehicle."  Docket No. 97 at p. 4.  The court interprets this argument as one that Mr. Thomas proffers in the event probable cause did not exist for the wide turn.  Id. (citing United States v. Cortez, 449 U.S. 411, 417–18 (1981)).  Because this court has found probable cause existed for the traffic stop, that showing is unnecessary.  The observation of Mr. Thomas' wide turn was sufficient to effectuate the traffic stop.

### B.    Whether the traffic stop was unconstitutionally prolonged

Mr. Thomas next argues that the traffic stop was unconstitutionally extended beyond the scope of addressing a traffic violation, and therefore, "all evidence obtained as a result . . . should be excluded."  Id. at p. 5.  The government argues that the odor of marijuana coming from Mr. Thomas' vehicle provided probable cause to extend the stop.  Docket No. 100 at pp. 5–6.

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."  Illinois v. Caballes, 543 U.S. 405, 407 (2005); Rodriguez v. United States, 575 U.S. 348, 354 (2015).  An example is when a traffic stop is "prolonged beyond the time reasonably required" to issue a warning, or a ticket.  Caballes, 543 U.S. at 407.  Such an unjustified extension transforms a reasonable seizure into an unreasonable one, triggering the fruit

of the poisonous tree doctrine.  Cf. United States v. Callison, 2 F.4th 1128, 1129–31 (8th Cir. 2021).

The time reasonably required to effectuate a traffic stop includes "asking for a driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." United States v. Munroe, 143 F.3d 1113, 1116 (8th Cir. 1998) (citation omitted).  In the patrol car, it includes "computerized checks of . . . the driver's license and criminal history." United States v. Salkil, 10 F.4th 897, 898 (8th Cir. 2021) (citation and internal quotation marks omitted) (alteration in original).

The constitutional scope of a traffic stop may be expanded, however, when a police officer has reasonable "suspicion that a crime has been committed." United States v. McCarty, 612 F.3d 1020, 1025 (8th Cir. 2010) (citation omitted).  This suspicion must be based on "particularized, objective facts." Id.  Our courts look to the totality of the circumstances, "in light of the officer's experience," to determine whether the officer's suspicion was reasonable.  Id. (quotation omitted).

In the Eighth Circuit, an officer's detection of the odor of marijuana allows the officer to expand the scope of a traffic stop to investigate that odor. United States v. Williams, 955 F.3d 734, 737 (8th Cir. 2020) ("We have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception.").  The Eighth Circuit reaffirmed this position earlier this year. United States v. Milk, 66 F.4th 1121, 1131 (8th Cir. 2023).  Although the legality of marijuana varies

21

among the 50 states as a matter of state law, as of the writing of this opinion,
marijuana is illegal under federal law (Controlled Substances Act, 21 U.S.C. §
801) and illegal in South Dakota without a medical marijuana card.  See 21
U.S.C. § 812; SDCL §§ 22-42-6, 22-42-24, 24-20G-1.

In the instant case, Officer VanVoorst testified that upon first
approaching the driver's side window of Mr. Thomas' vehicle, he smelled raw
marijuana.  Officer VanVoorst testified that he is well-acquainted with the
smell of raw marijuana from his experience and training as a K9 officer.  He
further testified on cross-examination that he can distinguish between the
smell of raw marijuana and hemp.

Mr. Thomas argues that "it is not reasonable to believe that [Officer]
VanVoorst smelled marijuana."  Docket No. 97 at p. 7.  Mr. Thomas also
questions Officer VanVoorst's credibility.  Mr. Thomas takes issue with the fact
that Officer VanVoorst failed to mention that he smelled marijuana when the
officer on the narcotics channel radioed, "You're [gonna] want your dog."  Id. at
pp. 6–7.  But Mr. Thomas steers this court away from the obvious.  Officer
VanVoorst discovered what he believed to be 1 to 1 1/2 pounds of raw
marijuana on the passenger seat and in a tote on the passenger side floorboard
of Mr. Thomas' car.  Ex. 1, Clip 2 at 20:18:30, 20:20:26.  This find included a
Ziploc bag sitting openly on the passenger seat, stuffed with raw marijuana.
Id. at 20:18:30.

Officer Pollema testified that he smelled marijuana when he approached
the B pillar of Mr. Thomas' vehicle, and Officer Horn testified that he smelled it

the moment Mr. Thomas opened his car door.  Questioning their credibility at the suppression hearing, defense counsel argued it was "real convenient" that all three officers agreed about the smell of marijuana, despite some of their reports failing to mention it.  In order to accept Mr. Thomas' credibility attack, the court would have to find all three officers were willing to perjure themselves testifying at the hearing in this matter.  To the contrary, the court found all three officers to be credible.  Each of their accounts of the odor of marijuana corroborates the other officers' testimony.

Because this court finds the testimony of Officer VanVoorst (and Officers Horn and Pollema) credible as to the smell of marijuana upon his first interaction with Mr. Thomas, the corresponding, immediate, expansion of scope for the traffic stop was lawful.

## C.    Whether the warrantless search of the vehicle was unconstitutional

On similar credibility grounds, Mr. Thomas argues that the warrantless search of his vehicle violated the Fourth Amendment.  Docket No. 97 at pp. 5–7.  The government again relies on the odor of marijuana to support the search.  Docket No. 100 at pp. 5–7.

Just as an unreasonable seizure violates the command of the Fourth Amendment, so does an unreasonable search of "persons, houses, papers, and effects."  U.S. CONST. amend. IV.  Consequently, evidence obtained due to an unreasonable search is inadmissible under the fruit of the poisonous tree doctrine.  Mapp, 367 U.S. at 655.  A "search" is effectuated when the government physically intrudes on a constitutionally protected area.  Florida v.

Jardines, 569 U.S. 1, 5 (2013).  A search is "*per se* unreasonable under the Fourth Amendment . . . if the police making the search have not first secured from a neutral magistrate a warrant."  Robbins v. California, 453 U.S. 420, 423 (1981) (plurality opinion), overruled on other grounds, United States v. Ross, 456 U.S. 798 (1982).

The Supreme Court recognizes exceptions to this general warrant requirement.  Katz v. United States, 389 U.S. 347, 357 (1967).  Among these exceptions is the "automobile exception."  United States v. Keck, 2 F.4th 1085, 1089 (8th Cir. 2021) (citations omitted).  The automobile exception jurisprudence was developed in response to the unique nature of motor vehicles.  To wit: unlike a stationary structure such as a house, the "ready mobility" of a vehicle allows a suspect to quickly transport evidence into a different jurisdiction.  Collins v. Virginia, 584 U.S. ___, ___, 138 S. Ct. 1663, 1669 (2018).  So, while the Fourth Amendment recognizes a privacy interest in automobiles, California v. Carney, 471 U.S. 386, 390 (1985), it also concedes that "an immediate intrusion is necessary" when "officers have probable cause to believe the vehicle contains contraband."  Ross, 456 U.S. at 806–08.

As discussed above, the smell of marijuana is sufficient to establish probable cause to search in the Eighth Circuit.  Milk, 66 F.4th at 1131; see also United States v. Schostag, 895 F.3d 1025, 1028 (8th Cir. 2018) ("Under federal law, marijuana is contraband for *any* purpose, including for medical purposes.") (citations and internal quotation marks omitted) (emphasis in original). Because this court found credible Officer VanVoorst's (and Officer

Horn's and Pollema's) testimony that he smelled marijuana during his first interaction with Mr. Thomas, and because marijuana is *always* contraband under federal law, it was incumbent upon Officer VanVoorst to execute the immediate intrusion of Mr. Thomas' vehicle, lest evidence be ferried away.  The search of Mr. Thomas' vehicle was constitutional.

**D.    Whether Mr. Thomas' statements to the officers should be suppressed for failure to Mirandize.**

Finally, Mr. Thomas argues that he was in custody and not Mirandized from when he was first approached and questioned by Officers Pollema and Horn, and therefore, any statements he made in response to police questioning thereafter must be suppressed.  Docket No. 107 at pp. 2–5.  Mr. Thomas places special emphasis on the fact that Officer VanVoorst believed probable cause was predicated on Mr. Thomas' negative response to the question of whether he held a medical marijuana card.  Id. at pp. 1, 4.  The government responds that Mr. Thomas was not in custody until his formal arrest following Officer VanVoorst's discovery of contraband, and secondly, that asking for a medical marijuana card is akin to asking for a driver's license—not an interrogation subject to Miranda scrutiny.  Docket No. 109 at pp. 4–10.  This court will address each of the government's arguments in turn.

**1.    Mr. Thomas was questioned during a Terry stop, not while in custody.**

The government first argues that Mr. Thomas was not in custody during the questioning, so Miranda does not apply.  This court agrees.

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V. This command is known as the right against self-incrimination.  See, e.g., United States v. Solis, 915 F.3d 1172, 1177 (8th Cir. 2019) (per curiam).

In the mid-twentieth century, the Supreme Court responded to questionable police practices in eliciting confessions by requiring officers to warn a suspect in custody, before interrogation, of their right against self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 439–79 (1966).  This "Miranda" warning lists the component rights within the broader right against self-incrimination:

> [The suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 478–79.

These rights are collectively known as a suspect's "Miranda rights."  See, e.g., Colorado v. Connelly, 479 U.S. 157, 169 (1986); see also United States v. Linder, 759 F. Supp. 2d 1133, 1138 (D.S.D. 2010) ("Rasmussen read Linder his Miranda rights.").

The requirement that officers read a suspect his Miranda rights before questioning is a constitutional rule.  Dickerson v. United States, 530 U.S. 428, 444 (2000).  Because that constitutional rule is grounded in the suspect's Fifth Amendment right against self-incrimination, the remedy for an officer's violation of the rule is the suppression of any compelled testimony.  United

States v. Patane, 542 U.S. 630, 637–38 (2004) (plurality opinion).  Suppression

does not extend to physical evidence that results from the suspect's

statements.  United States v. Beasley, 688 F.3d 523, 531 (8th Cir. 2012) (citing

Patane, 542 U.S. at 633–34; id. at 644–45 (Kennedy, J., concurring))

(suppression of physical evidence "not the appropriate remedy").

     A suspect is in custody when, "given the totality of the circumstances, a

reasonable person would [not feel] at liberty to terminate the interrogation and

leave or cause the agents to leave." United States v. Vinton, 631 F.3d 476, 481

(8th Cir. 2011) (citation omitted).  Put another way, a suspect is in custody

when "there is a formal arrest or restraint on freedom of movement of the

degree associated with a formal arrest." Id. (citation omitted).

     Due to the "temporary and brief" nature of ordinary traffic stops, a

motorist subject to questioning during such a stop is not in custody.  Berkemer

v. McCarty, 468 U.S. 420, 437–42 (1984).  Our courts, instead, liken a traffic

stop to what is known as a Terry stop.[6]  A Terry stop is a "brief, investigatory"

detention allowable under the Constitution "when [an] officer has a reasonable,

articulable suspicion that criminal activity is afoot." Haynes v. Minnehan, 14

F.4th 830, 835 (8th Cir. 2021).

     The permissible scope of a Terry stop is to "confirm or dispel [an officer's

suspicion] in a short period of time." United States v. Wheat, 278 F.3d 722,

738 (8th Cir. 2001) (quotation omitted).  To that end, "an officer may ask the

detainee a moderate number of questions." United States v. Gilliam, 520 F.3d

---

[6] Terry v. Ohio, 392 U.S. 1 (1968).

844, 847 (8th Cir. 2008) (quotation omitted).  An officer may also "conduct a limited pat-down search of the individual's outer clothing for the purpose of uncovering concealed weapons if the officer has a reasonable, articulable suspicion that the person is armed and dangerous." Id.  When a "person is suspected of being involved in a drug transaction," "it is reasonable for an officer to believe [that] person may be armed and dangerous." United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir. 2005) (citation omitted). Ultimately, an officer should "employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the temporary seizure." United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005) (quotation omitted).

Whether related to a traffic violation—or any type of crime—a suspect is not in custody during a Terry stop. Maryland v. Shatzer, 559 U.S. 98, 112–13 (2010) (citations omitted).  And when a suspect is first detained on a traffic violation, the advent of new individualized suspicion for a different crime gives rise to a new Terry stop, with the attendant ability of the officer to confirm or dispel once again. Rodriguez v. United States, 575 U.S. 348, 357–58 (2015). Custody does not begin because the nature of the detention remains temporary.

"There is no rigid time limit on an investigatory detention." Maltais, 403 F.3d at 556–57.  The duration of a traffic stop extended by a new suspicion remains reasonable so long as the "officers diligently pursue the mission and

do not cause measurable delay." United States v. Magallon, 984 F.3d 1263, 1278 (8th Cir. 2021).

In the instant case, probable cause to initiate the Terry stop was for Mr. Thomas' traffic violation.  Upon his first approach of Mr. Thomas' vehicle, Officer VanVoorst testified that he smelled marijuana.  This smell gave rise to a new Terry stop—one investigating the illegal possession of marijuana.  From the time Officer VanVoorst first initiated the stop to the time of the vehicle search, less than ten minutes transpired.  See Ex. 1, clip 2 at 20:11:53; id. at 20:17:13.  Within this brief period, Officers Pollema and Horn had Mr. Thomas exit the vehicle to perform a protective pat-down, justified by suspicion of drug activity, and asked him a "moderate number of questions" to "confirm or dispel" that suspicion.  Bustos-Torres, 396 F.3d at 943; Gilliam, 520 F.3d at 847; Wheat, 278 F.3d at 722.  It was during this questioning and before the vehicle search that Mr. Thomas informed the officers that he did not possess a medical marijuana card.  Accordingly, this court finds that the statement Mr. Thomas seeks to suppress was made during a valid Terry stop, and thus not subject to Miranda requirements.  Shatzer, 559 U.S. at 112–13.

### 2.    Even if Mr. Thomas was in custody, was the question of the medical marijuana card an "interrogation."

The government also argues that asking for a medical marijuana card is not the type of question that consists of "interrogation."  This argument is not persuasive.

Even when a suspect is in custody, "[n]ot all questioning of a suspect by the police amounts to interrogation."  United States v. Familetti, 878 F.3d 53,

58 (2nd Cir. 2017).  For example, when public safety is an immediate concern, the command of <u>Miranda</u> must give way to an officer's need for spontaneity. <u>New York v. Quarles</u>, 467 U.S. 649, 655–56 (1984).  Questions "normally attendant to arrest and custody" also fall outside <u>Miranda</u> scrutiny.  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).  Such questions are those "reasonably related to the police's administrative concerns."  <u>United States v. Tapia-Rodriguez,</u> 968 F.3d 891, 896 (8th Cir. 2020) (citations omitted). Examples are asking "whether a suspect will take a blood-alcohol test," or asking permission to search.  <u>Id.</u> (citation omitted); <u>United States v. Payne</u>, 119 F.3d 637, 643 (8th Cir. 1997).

Questioning becomes "interrogation" when the question is "reasonably likely to elicit an incriminating response from the suspect."  <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 600–01 (1990).

In the instant case, the government first argues that the medical marijuana question was not interrogation because Mr. Thomas (allegedly) believed that, as a Californian, he could legally possess in South Dakota. Docket No. 109 at p. 9.  This theory is grounded upon <u>Innis</u>' assertion that "the latter portion of the [reasonably likely to elicit an incriminating response from the suspect] definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."  446 U.S. at 301.  So, the argument goes, if Mr. Thomas did not perceive he was committing a crime, then he was not being interrogated.

The government misapplies <u>Innis</u>. In that case, two police officers held a conversation while a robbery suspect sat in the back of their police wagon. <u>Id.</u> at 294. Their discussion concerned the dangers of handicapped children finding a missing shotgun, and the officers elicited an unexpected confession from the suspect. <u>Id.</u> at 294–95. The Court held the suspect was not "interrogated" because "[t]here was nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children." <u>Id.</u> at 302. The confession was an "unforeseeable result" of the conversation. <u>Id.</u> The takeaway is that the "perceptions of the suspect" are understood through the lens of what the government knows about a suspect at the time of its conduct. So, "where a police practice is <u>designed</u> to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." <u>Id.</u> at 301 n.7 (emphasis added).

<u>Innis</u> defines "an incriminating response" as "any response – whether inculpatory or exculpatory – that the prosecution may seek to introduce at trial." <u>Id.</u> at 301 n.5 (emphasis deleted). Officer VanVoorst had Officer Pollema ask about the medical marijuana card because he believed criminality depended on the answer. Ex. 1, clip 2 at 20:18:06. Officer VanVoorst had smelled marijuana and knew that if Mr. Thomas answered in the negative, that would implicate criminal activity and would provide probable cause to search Mr. Thomas' vehicle. Like in <u>Innis</u>, whether Mr. Thomas answered yes or no,

31

the question was "designed to elicit an incriminating response." Id. at 301 n.7.
The government's assertion that the interrogatory nature of the question can be
retroactively neutralized by the content of Mr. Thomas' answer finds no
support in law.

      The government also suggests that asking about the existence of a
medical marijuana card "is analogous to the investigatory questions of asking
for a driver's license, vehicle registration, and proof of insurance." Docket No.
109 at p. 10.  But the interrogation analysis turns on the foreseeable
incriminating nature of the response, not the subject matter of the question.
Innis, 446 U.S. at 301.  Even requests for "routine information necessary for
basic identification purposes" becomes interrogation when the answer "is
directly relevant to the substantive offense charged." Tapia-Rodriguez, 968
F.3d at 897 (citations omitted).  Because the existence of a medical marijuana
card was, in Officer VanVoorst's opinion, directly relevant to the charge for
which he was investigating, the administrative exception to Miranda does not
apply.

      As stated above, this court has concluded that Mr. Thomas was not in
custody at the time he was asked if he possessed a medical marijuana card.
Because violation of Miranda requires both that the suspect be in custody and
that he be subjected to interrogation, the court recommends denying
Mr. Thomas' motion to suppress his statement.  However, if a subsequent
reviewing court finds to the contrary that Mr. Thomas was indeed in custody at

the time this question was asked, then the court concludes that the statement should be suppressed because the question did constitute interrogation.

## CONCLUSION

Based on the facts, law, and analysis discussed above, this magistrate judge respectfully recommends denying Mr. Thomas' motions to suppress in their entirety [Docket Nos. 96 and 106].

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990); Nash v. Black, 781 F.2d 665, 667 and n.3 (8th Cir. 1986).

DATED this 29th day of August, 2023.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge